**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

STEVEN GEORGE KELLY,
  *Defendant-Appellant.*

No. 98-4522

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

DANIEL KELLY,
  *Defendant-Appellant.*

No. 98-4527

Appeals from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(CR-96-33-V)

Argued: April 3, 2001

Decided: August 1, 2001

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

―――――――――――――――――――

Affirmed in part and vacated and remanded in part by unpublished
per curiam opinion.

―――――――――――――――――――

**COUNSEL**

**ARGUED:** Paul Morris, LAW OFFICES OF PAUL MORRIS, P.A., Coral Gables, Florida, for Appellant Daniel Kelly; Robert Alan Rosenblatt, Pinecrest, Florida, for Appellant Steven Kelly. Gretchen C.F. Shappert, Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

A jury convicted Steven and Daniel Kelly of a single crime — conspiracy to possess with intent to distribute "a quantity of cocaine and cocaine base" in violation of 21 U.S.C. § 846 (1994). The district court sentenced each of them to 360 months imprisonment. They appeal, asserting a myriad of trial and sentencing errors. We affirm their convictions but vacate their sentences and remand for re-sentencing.

I.

We first set forth only those facts necessary to understand the legal issues discussed within.

In April 1996, Michael D'Ambrosia, an agent of the Florida Department of Law Enforcement, met with James Harrington, a cooperating informant, who told him of the activities of two brothers, living in the Miami area, Daniel and Steven Kelly. After D'Ambrosia determined that the Kellys met "the criteria for investigation" by his unit, he instructed Harrington to approach them.

Harrington did so and recorded several conversations with Daniel Kelly. Daniel explained to Harrington that he had developed a system to "thwart[ ] law enforcement" whenever he ran into trouble: Daniel would periodically work for law enforcement agencies as an informant, so, if arrested, he could claim that what appeared to be illegal actually constituted the role-playing activity of a government agent. Daniel also brought up the subject of narcotics distribution; he told Harrington that he was involved in narcotics trafficking in North Carolina, that he had received numerous requests for cocaine, that he needed an additional source for cocaine, and then asked Harrington to be that source.

D'Ambrosia permitted Harrington to agree to supply cocaine to Daniel in North Carolina. In November 1996, Harrington told Daniel that he would bring two kilograms of cocaine to North Carolina to sell to Daniel. Daniel agreed, relating to Harrington that Steven had already brought four or five kilograms of cocaine to North Carolina and that the brothers had recently sold a kilogram of cocaine in North Carolina for $28,000.

After checking the records of various law enforcement agencies, D'Ambrosia found no evidence that either Kelly brother was acting as a documented police informant. But because Daniel had told Harrington that he had worked with the Metro Dade Police Department, D'Ambrosia contacted that office and learned that Officer Bobby Haloren had some prior contact with Daniel. On November 14, 1996, Haloren, at D'Ambrosia's request, set up a meeting with the Kelly brothers, which Haloren and D'Ambrosia attended. During this meeting, recorded by D'Ambrosia, the Kellys described their drug contacts in North Carolina, and suggested that they could help the officers set up those persons for arrest. The Kellys did not mention Harrington or the agreement to purchase cocaine from him in North Carolina. The officers responded that they would look into the Kellys' claims, but specifically instructed the Kellys "not to go to North Carolina until we, as law enforcement, conducted an inquiry into the information that they were providing us."

Nevertheless, within a few days, both Daniel and Steven Kelly traveled from Florida to North Carolina, where they stayed with their long-time friend, Richard Gregg, a Miami lawyer and former room-

mate of Steven Kelly. Gregg was temporarily living with his parents in North Carolina seeking to combat a serious cocaine addiction. Daniel told Gregg that the Kellys came to North Carolina to purchase two kilograms of cocaine, and that Steven had pre-sold one of the kilograms to a dealer, Daryl Parkhurst, in Boone, North Carolina for $25,000. Daniel planned to meet Harrington, who would "front" him one kilogram of cocaine. Daniel would then give that kilogram to Steven, who would immediately sell it for $25,000, allowing the Kellys to return and buy the second kilogram.

Daniel arranged to meet Harrington in a hotel room in Hickory, North Carolina on November 22, 1996 to conduct the two kilogram deal. Law enforcement officers provided Harrington with a rental car and placed two kilograms of cocaine in a cooler in the trunk of the car. The officers understood that Daniel would arrive with $25,000 to purchase at least one kilogram of cocaine.

That morning, Gregg drove Daniel to the meeting point, and then waited in a restaurant across the street for Daniel to return from completing the deal. When Daniel arrived on the scene, he asked Harrington to "front" him the first kilogram, telling Harrington that his brother, Steven, was already in the area, had already sold that kilogram, and would return shortly with the money. Harrington refused to "front" the cocaine or release any of it to Daniel. Instead, Harrington told Daniel to go and talk to his brother and obtain the money to purchase the drugs.

Before Daniel could leave, however, the officers monitoring the meeting placed him under arrest. Daniel immediately told the arresting officers that he was working with the DEA as a confidential informant. The officers then asked Daniel if he would call his brother, and Daniel agreed. Steven Kelly arrived soon thereafter, and the police arrested him as well.

The officers found Gregg waiting for Daniel in the restaurant across the street and questioned him. The government never prosecuted Gregg; rather, he testified at the Kellys' trial on behalf of the government. In addition to describing his participation in the reverse-sting, Gregg testified that in 1995, Steven Kelly had supplied him with cocaine, had kept between a quarter and a half a kilogram of

cocaine in the apartment they shared, and had discussed selling cocaine. Gregg further testified that during 1995 Daniel Kelly told him that he used $60,000 to purchase illegal drugs. Additionally, Gregg explained that he knew of at least three cocaine deals between Steven and Daryl Parkhurst in the summer and fall of 1996, each deal involving between two and three kilograms of cocaine, and that Steven had placed Gregg in contact with Parkhurst so that he could purchase several grams of cocaine for his personal use. Gregg also testified that in the summer of 1996 Steven introduced him to a cocaine supplier who also transported cocaine from Miami to North Carolina; Steven and the supplier actually showed Gregg one kilogram of cocaine. Finally, Gregg confirmed that Steven stated that his "fall-back" plan, if arrested, was to claim to be a DEA informant.

A jury convicted both Kellys of conspiracy to possess cocaine with intent to distribute beginning in January 1, 1995 and continuing to November 22, 1996. The district court sentenced them to thirty years imprisonment.

As noted above, the Kellys raise numerous arguments on appeal. Although we address only their two principal arguments, we have also carefully considered their remaining contentions. Because we have concluded that their additional claims are clearly meritless, we do not discuss them further.

## II.

Initially, and as their primary attack on their convictions, the Kellys assert that the government failed to offer sufficient evidence to convict them of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846.

To prove such a conspiracy the government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; (3) the defendant knowingly and voluntarily became a part of the conspiracy. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). Considering the "clandestine and covert" nature of most conspiracies, "a [cocaine] conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence

is adduced." *Id.* Challenges to the sufficiency of evidence "must over-come a heavy burden" and a court must, of course, "consider the evidence in the light most favorable to the government, making all inferences and credibility determinations in its favor." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995).

The Kellys maintain that the government's case against them fails because of a lack of evidence that they entered into any agreement to commit an unlawful act. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975) (the "essence" of conspiracy is "an agreement to commit an unlawful act"). The Kellys rely on Daniel's failure to bring sufficient funds to purchase the cocaine from Harrington, a government agent, at the reverse-sting and Steven's absence from the scene of the reverse-sting altogether. The Kellys maintain that neither of them reached any agreement with Harrington since the drug sale was never consummated, *see e.g.*, *United States v. Iennaco*, 893 F.2d 394, 397-98 (D.C. Cir 1990), that even if Daniel had entered into an agreement with Harrington, the agreement could not provide the basis for a conspiracy conviction since Harrington was a government agent, *see, e.g.*, *United States v. Lewis*, 53 F.3d 29, 33 (4th Cir. 1995), and that Steven's total absence from the meeting with Harrington establishes that he did not take part in any conspiracy.

The fundamental difficulty with these contentions is their premise — that the government's case rests on proof of a conspiracy between Harrington and Daniel, or Harrington and Steven. In fact, the government's case against the Kelly brothers was not based on a conspiracy with Harrington. Rather, the government presented evidence from which a jury could reasonably conclude that the Kellys conspired with *each other* (and Gregg) to distribute cocaine.

Harrington testified that Daniel approached him about obtaining cocaine, telling Harrington that he *and* his brother would purchase two kilograms of cocaine in North Carolina to distribute there. Gregg's testimony confirmed that *both* Daniel and Steven planned to purchase and distribute the drugs obtained from Harrington in North Carolina. Daniel told Gregg that he *and* his brother were coming to North Carolina "[t]o do a drug deal;" he even told Gregg "how the deal was going to work." Gregg testified that Daniel explained to him that:

[H]e was going to meet the person, his source, which he did not identify. That the source was going to have two kilos.

As soon as he met the source and saw he had the two kilos, he was going to go outside and meet Steven, who would then come over, take the first kilo, give it to Daryl, who had it pre-sold in Boone for $25,000.

Daryl would drive up, sell it, come back; and then with the $25,000 given to Steve, then would go back to Daniel, who would pay his source.

And then the second kilo would be fronted to them, or Daryl would have some time to sell it and then get the rest of the money, which would be their profit.

Moreover, Gregg explained that the night before the reverse-sting, Steven spoke with "Daryl" several times and then drove out to meet him. Finally, Gregg testified to his own participation in the deal — to driving Daniel "[t]o meet the source, James Harrington, to do the two kilo deal."

Independent acts of both Kelly brothers corroborated Gregg's and Harrington's testimony. Both Kellys met with Agent D'Ambrosia and confided intimate knowledge of drug trafficking in North Carolina. D'Ambrosia and other law enforcement officers specifically told the Kellys that they were not to travel to North Carolina, yet only days later both brothers went to North Carolina without notifying any law enforcement officer. Daniel actually attempted to obtain the cocaine from Harrington and Steven, a resident of Florida, was so close to the scene of the thwarted purchase that he quickly arrived there after Daniel called him.

Moreover, the government offered evidence that the Kellys engaged in other acts to further their drug conspiracy apart from the reverse-sting. As the district court found when it reviewed this issue on the Kellys' motion for acquittal, Gregg's testimony established a long pattern of drug activity during the period of the conspiracy. Contrary to the Kellys' contention that the government failed to charge

these other drug transactions, the indictment charged the Kellys with a conspiracy to possess and distribute cocaine with each other and unnamed co-conspirators from January 1, 1995 and November 22, 1996.

In sum, taking the facts in the best light for the prosecution, as we must, the government presented ample evidence to support the jury verdict that the Kellys engaged in a conspiracy to possess cocaine with intent to distribute.

## III.

We turn to the principal ground on which the Kellys challenge their sentences — their contention that their sentences violate the rule established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The government charged each Kelly brother with conspiracy to possess with intent to distribute "a quantity of cocaine and cocaine base," but the indictment did not specify the precise quantities of the cocaine or cocaine base, and the jury made no finding as to drug type or quantity. After conducting an extended sentencing hearing, the district court found by a preponderance of the evidence that Daniel Kelly was responsible for at least 2 but less than 3.5 kilograms of cocaine and Steven Kelly was responsible for at least 3.5 but less than 5 kilograms of cocaine. Both brothers were over eighteen years old at the time of the conspiracy and had previously been convicted of several violent or drug-related felonies. Relying on USSG § 4B1.1, the district court sentenced them, as career offenders, to 30 years imprisonment.

While this case was on appeal, the Supreme Court decided *Apprendi*, in which it announced a new rule of constitutional law. In *Apprendi*, the Court upheld a challenge to a hate-crime statute that included a sentence enhancement that the trial judge could apply upon finding by a preponderance of the evidence that the defendant's crime was motivated by racial animosity. The Supreme Court struck down the provision as unconstitutional, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

Although *Apprendi* involved a trial judge's application of a hate-crime sentence enhancement, federal appellate courts have uniformly applied its rule to 21 U.S.C. § 841. *See United States v. Promise*, ___ F.3d ___, No. 99-4737, 2001 WL 732389, at *5 (4th Cir. June 29, 2001) (collecting cases). The Kellys contend that because their sentences exceed § 841(b)(1)(C)'s twenty-year maximum, *Apprendi* requires that we remand their cases for re-sentencing.

Because the Kellys failed to raise their *Apprendi* argument before the district court, we review for plain error only. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). "Rule 52(b) contains three elements that must be established before we possess the authority to notice an error not preserved by a timely objection: The asserted defect in the trial proceedings must, in fact, be error; the error must be plain; and, it must affect the substantial rights of the defendant." *United States v. Cedelle*, 89 F.3d 181, 184 (4th Cir. 1996) (citing *Olano*, 507 U.S. at 731-32). Even when all three elements are present, we may decline to notice an error if it does not "'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

Recently, this court, sitting en banc, considered, in the context of 21 U.S.C. § 841, whether the failure to charge drug quantity in the indictment and submit the quantity issue to the jury required that we vacate the sentence and remand for re-sentencing under *Apprendi. See Promise*, 2001 WL 732389, at *1. The court was sharply divided and the decision contained five separate opinions. While a majority of the judges voted to affirm Promise's conviction, they did so on differing grounds.

Judge Wilkins announced the judgment of the court. In his opinion, Judge Wilkins concluded that *Apprendi* mandated that drug quantity be treated as an element of an aggravated drug offense under § 841, and that the failure to charge this offense element in the indictment and submit this issue to the jury constituted plain error. *See id.* at *8. Judge Wilkins also concluded that the error affected a defendant's substantial rights when the defendant's sentence for conspiring to distribute a controlled substance exceeded the twenty-year statutory maximum in 21 U.S.C. § 841(b)(1)(C). *See id.* A majority of the

court, made up of Judges Widener, Williams, Michael, Motz, Traxler and King, joined these parts of Judge Wilkins's opinion.

A different majority of the court voted nonetheless to affirm the defendant's conviction. Four judges, Chief Judge Wilkinson, and Judges Niemeyer, Luttig and Gregory, writing in three separate opinions, affirmed on the ground that, in the context of § 841, drug quantity was properly viewed as a sentencing factor, and not an offense element that needed to be charged in the indictment or submitted to the jury, and therefore the maximum sentence permitted by the statute was life imprisonment.

Judges Wilkins, Williams and Traxler also voted to affirm Promise's conviction, although on a different basis. These three members of the court agreed that the failure to treat drug quantity as an offense element in § 841 constituted plain error affecting the defendant's substantial rights. They nonetheless voted to affirm the conviction, concluding — on the basis of "a balancing of numerous considerations," including the strength of the government's evidence and the fact that a pre-trial notice of drug quantity was provided to the defendant — that the error should not be corrected, *id.* at *10 n.9; Chief Judge Wilkinson joined this portion of their opinion on the ground that, assuming arguendo "there was an error in the proceedings below," it did not merit reversal under *Olano*. *Id.* at *11. These judges did not address precisely how they weighed these considerations, or which consideration was dispositive. *See id.* at *35 n.3 (Motz, J., concurring in part and dissenting in part). However, they repeatedly characterized the pretrial notice as "critical," *id.* at *10 & n.9, and did not respond to the dissent's suggestion that, in light of this emphasis, absent such pretrial notice, "even overwhelming and uncontroverted evidence of a defendant's guilt" would be an "insufficient" basis "*not* to notice" such an error. *Id.* at *35 n.3 (Motz, J., concurring in part and dissenting in part). Given this, we believe that such notice is indeed critical to these judges' decision as to whether to correct the error.

Four other members of the court, Judges Widener, Michael, Motz and King, dissented from the judgment in *Promise*, concluding that this court would abuse its discretion in failing to notice and correct the plain error regardless of the strength of the prosecution's evidence or whether pre-trial notice was provided to the defendant, and so

voted to vacate the defendant's illegal sentence and remand for re-sentencing. *See id.* at *33 (Motz, J., concurring in part and dissenting in part). Moreover, in an opinion concurring in the judgment, two other members of the court similarly indicated their view that if drug quantity were an element (and they did not believe it was), failure to charge it constituted plain error that had to be corrected. *See id.* at *13 (Niemeyer, J., concurring in the judgment, joined by Gregory, J.).

Applying *Promise* here, it is clear that imposition of thirty-year sentences on the Kellys for an offense element — drug amount — that was neither charged in the indictment nor proven to the jury con-stitutes plain error. In *Promise*, this court held that *Apprendi* mandates this result. Moreover, this error affects the Kellys' substantial rights, just as in *Promise* this court held that a similar error affected Prom-ise's substantial rights. The only remaining issue, then, is whether we should exercise our discretion to correct the error.

No matter what view is taken as to the proper approach to this ulti-mate question, i.e., whether pre-trial notice and the strength of the government's evidence have any place in determining whether to cor-rect this plain error, in this case the result is the same — the plain error must be corrected. First, under the approach and for the reasons articulated by the four dissenters in *Promise*, the error must be cor-rected because, regardless of any pre-trial notice or strong govern-ment evidence, "sentencing a man for a crime for which he was neither charged nor convicted affects the fairness, integrity and public reputation of judicial proceedings." *Id.* at *33 (Motz, J., concurring in part and dissenting in part). *See also id.* at *13 (Niemeyer, J., concur-ring, joined by Gregory, J.). Moreover, if a pretrial notice is indeed of "critical" import, as other members of the *Promise* court believed, *id.* at *10 & n.9, the plain error in this case must be corrected because the government provided *no* pretrial notice informing the Kellys of the amount of drugs it attributed to them. Thus, that factor, which was "critical" to the decision of the members of the majority who found plain error but declined to correct that error in *Promise*, is absent here.

In sum, under either approach, we must conclude that the plain error affecting the Kellys' substantial rights — failure to charge in the indictment the essential element of drug amount — "'seriously affec-t[ed] the fairness, integrity or public reputation of judicial proceed-

ings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Accordingly, we exercise our discretion to notice and correct this error, and vacate the Kellys' sentences and remand for re-sentencing.

IV.

For the foregoing reasons, we affirm the convictions of Steven Jerome Kelly and Daniel Kelly, but vacate their sentences and remand for re-sentencing.*

*AFFIRMED IN PART AND VACATED
AND REMANDED IN PART*

---

*Under the enhanced penalties provision of § 841(b)(1)(C), the statutory maximum for those, like the Kellys, who are convicted of violating § 846, "after a prior conviction for a felony drug offense has become final," is thirty years. If the district court had sentenced the Kellys under § 841(b)(1)(C), this case would not present an *Apprendi* issue because their thirty-year sentences would not exceed the statutory maximum.

For the government to take advantage of § 841(b)(1)(C), however, it must file a pre-trial notice under 21 U.S.C. § 851 identifying the prior offenses upon which it intends to rely. *See United States v. Foster*, 68 F.3d 86, 89 (4th Cir. 1995). The Kellys claim that the government failed to file timely § 851 notices. When they raised this objection at their sentencing hearing, the government maintained that "the point [was] moot" given the district court's application of the career offender provisions of the sentencing guidelines. For this reason, the district court never resolved the factual dispute over the timeliness of the government's § 851 notices. Because the district court did not sentence the Kellys under § 841(b)(1)(C) or ever find the § 851 notices timely, we cannot affirm their sentences on this basis. The government, however, may of course argue to the district court at re-sentencing that it did indeed timely file the § 851 notices. *See United States v. Henaud*, 81 F.3d 484, 487 (4th Cir. 1996) (district court may consider sentencing argument at resentencing — even if argument waived at prior sentencing — if not barred from doing so by appellate court mandate).